UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:22-cv-04261-JLS Date: August 21, 2023
Title: In re: Santa Clarita, LLC

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

| Gabby Garcia | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| Not Present | Not Present |

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS (DOC. 58), AND GRANTING IN PART DEFENDANT'S MOTION TO STRIKE (Doc. 59)**

Before the Court are Defendant City of Santa Clarita's Motion to Dismiss and Motion to Strike. (Docs. 58, 59.) Plaintiff Bermite Recovery LLC ("Bermite") opposed both motions, and Santa Clarita replied. (Docs. 71, 72, 80, 81.) Having heard oral argument, considered the papers, and for the reasons set forth herein, Santa Clarita's Motion to Dismiss is GRANTED IN PART and its Motion to Strike is GRANTED IN PART.

## I. BACKGROUND

The parties are familiar with the facts of this case, and the Court has set forth the facts and background in great detail in its prior Orders. (*See* Order Granting in Part Defendant's Motion to Dismiss, Doc. 52; Order Denying Plaintiffs' Motion for Reconsideration, Doc. 73.)

In brief, this case concerns the development of a 996-acre property (the "Property") in Santa Clarita, composed of two parcels, Parcel A, approximately 972 acres, and the adjacent Parcel B, approximately 24 acres. In 1996, Santa Clarita entered into a Development Agreement with Whittaker Corporation to develop the Property in

accordance with a Vesting Tentative Tract Map ("VTTM") and the Porta Bella Specific Plan that the Santa Clarita City Council had approved in 1995. (Second Amended Complaint ("SAC") ¶¶ 12-13.) Because the Property had historically been used for the manufacture, testing, and storing of munitions, environmental remediation was required. (SAC ¶¶ 10-11.) When the City Council approved the Specific Plan and VTTM in 1995, it set as a condition of approval that the future developer must remediate the Property (the "DS-12 Provision"). (*See* Doc. 53-12; Doc. 60 at 35.) Bermite acquired Parcel B, and all the vested rights and entitlements to develop under the Development Agreement, the VTTM, and the Specific Plan, in early 2000. (SAC ¶ 23.)

Paragraph 7(i) of the Development Agreement states that the agreement "shall extend twenty (20) years from the date all conditions have been satisfied, but in no event shall the Term expire later than January 1, 2021." (Development Agreement, Doc. 53-1 at 42.) However, it goes on to provide that the term of the agreement "shall automatically be extended for the period of time of any actual delay resulting from any . . . delays described in Paragraph 7(e)." (*Id.*) Paragraph 7(e) is a force majeure provision, entitled "Enforced Delay, Extension of Time for Performance." It states:

> In addition to specific provisions of this Agreement, whenever a period of time, including a reasonable period of time, is designated within which either party hereto is required to do or complete any act matter or thing, the time for the doing or completion thereof and the Term of this agreement shall be extended a by a period of time equal to the number of days during which such party is prevented from, or is unreasonably interfered with, the doing or completion of such act, matter or thing because of causes beyond the reasonable control of the party to be excused, including: war; insurrection; strikes; walkouts; riots; floods; earthquakes; fires; casualties; and acts of God; and court actions (such as restraining orders or injunctions).

(*Id.* at 40.)

After acquiring Parcel B, Bermite engaged in environmental clean-up of the Property, which was substantially completed in September 2019. (SAC ¶¶ 33-36.)

Bermite alleges that between 2017 and 2019, it "sought a joint venture partner or lender to obtain the capital necessary to pay off the then-current debt on the Property, pay all property taxes on the Property, and proceed with development of the Project." (SAC ¶¶ 45-59.) It details a number of business opportunities that it negotiated in that time. (*Id.*) However, "each of the . . . prospective joint venture partners and lenders refused to continue negotiating" after speaking with Santa Clarita personnel. (*Id.* ¶ 59.) In these communications, Bermite alleges, "the City stated to each of the prospective joint venture partners and lenders that Bermite and [Santa Clarita LLC ("SCLLC")] did not have vested rights and entitlements to develop the Project." (*Id.* ¶ 57.) These statements were made in accordance with a so-called "Unlawful Policy" that Bermite alleges Santa Clarita implemented to:

(1) Disavow and repudiate the Specific Plan, the [Development Agreement], and the VTTM;
(2) Disavow and repudiate Bermite's and SCLLC's vested rights and entitlements under the [Development Agreement], including the VTTM and the Specific Plan;
(3) "Run out the clock" on Bermite's and SCLLC's rights under the [Development Agreement] by thwarting and delaying their efforts to obtain financing sufficient to fully perform under the [Development Agreement] by the [Development Agreement] termination date. The City planned and intended to do this by telling RFI's, SCLLC's, and Bermite's prospective joint venture partners and lenders that Bermite and SCLLC did not have vested rights and entitlements to develop the Project on the Property; and
(4) [F]avor a third party – Blue Ox Holdings, LLC ("Blue Ox") – as the new owner and developer of the Property and use its influence to cause Bermite and SCLLC to lose any and all ownership rights in the Property.

(*Id.* ¶ 61.) According to Bermite, Santa Clarita's statements "were a repudiation of the [Development Agreement]" and Bermite lost its business opportunities "as a result of the

City's statement about SCLLC's and Bermite's lack of vested rights and entitlements." (*Id.* ¶¶ 58-59.)

On July 23, 2020, Bermite sent Santa Clarita a Request for Time Extension ("RFTE") requesting that the term of the Development Agreement be extended five years, until January 1, 2026. (*Id.* ¶ 78; RFTE, Doc. 53-12.) It argued that the Development Agreement's automatic extension provision had been triggered by two events that fell under paragraph 7(e) of the agreement: delays in development due to the environmental remediation required by the DS-12 Provision, and Santa Clarita's frustration of Bermite's attempts to find financing through the enactment of its "Unlawful Policy." (*Id.* ¶¶ 81-82.) Santa Clarita rejected Bermite's requested extension and the Development Agreement terminated on January 1, 2021. (*Id.* ¶ 90.)

Plaintiff Bermite and now-dismissed plaintiff Remediation Financial, Inc. ("RFI"), along with former plaintiff SCLLC, commenced this adversarial proceeding in Arizona bankruptcy court on July 2, 2021. *See Santa Clarita, LLC v. City of Santa Clarita*, No. 2:21-ap-00178-MCW (Doc. 1). The action was transferred to this Court on June 24, 2022. (Doc. 18.) On April 13, 2023, the Court granted in part Santa Clarita's Motion to Dismiss, finding that RFI lacked standing in the action. (Doc. 52.) Bermite filed a Second Amended Complaint on April 27, 2023. (SAC, Doc. 53.) Bermite brings the following claims: (1) deprivation of procedural and substantive due process in violation of 42 U.S.C. § 1983; (2) tortious interference with prospective economic advantage; (3) breach of contract; (4) breach of implied covenant of good faith and fair dealing; and (5) inverse condemnation. (*Id.* ¶¶ 93-129.)

Santa Clarita now moves to dismiss all of Bermite's claims under Rule 12(b)(6) and to strike its claims for tortious interference, breach of contract, and breach of good faith under California Code of Civil Procedure § 425.16.

## II. <u>LEGAL STANDARDS</u>

### A. Rule 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Further, courts must construe the facts in the light most favorable to the non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Thus, a complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### B. Cal. Code Civ. Proc. § 425.16

California's anti-SLAPP statute allows for pre-trial dismissal of "SLAPPs," or Strategic Lawsuits against Public Participation. Cal. Civ. Proc. Code § 425.16; *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). The anti-SLAPP statute aims to identify, early in the litigation process, "meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife*, 264 F.3d at 839. It applies to causes of action "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1).

"A court considering a motion to strike under the anti-SLAPP statute must engage in a two-part inquiry." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003). "First, the defendant must make an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech." *Id.* (quotations omitted). While California's anti-SLAPP statute must be read broadly, the California Supreme Court has recognized that the "arising from requirement is not always easily met." *Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 66 (2002). "[T]he mere fact an action was filed after protected activity took place does not mean it arose from that activity." *Id.* Instead, the Court's focus is on "the principal thrust or gravamen of the causes of action, i.e., the allegedly wrongful and injury-producing conduct that provides the foundation for the claims." *Castleman v. Sagaser*, 216 Cal. App. 4th 481, 490-91 (2013).

Where a defendant makes this first-step, prima facie showing, the Court proceeds to the second step of the anti-SLAPP analysis and "the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Vess*, 317 F.3d at 1110 (quotations omitted). In other words, "the plaintiff must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by plaintiff is credited." *Metabolife*, 264 F.3d at 840 (quotations omitted).

The Ninth Circuit has given guidance on how California's anti-SLAPP statute fits within the framework of federal civil procedure: "Anti-SLAPP motions are hybrids of motions to dismiss and motions for summary judgment." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 836 (9th Cir. 2018) (Gould, J., concurring). That is, "when an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Id.* at 834 (majority op.). "[O]n the other hand, when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard [applies]." *Id.*

## III. <u>ANALYSIS</u>

The Court first addresses Bermite's section 1983 and inverse condemnation claims. It then analyzes whether California's anti-SLAPP statute applies to Bermite's state-law claims, and considers whether dismissal and striking of those claims is warranted.

### A. Section 1983 and Inverse Condemnation

Bermite alleges that it had protectible property and liberty interests in its ownership of Parcel B and the vested rights and entitlements it had under the Development Agreement. It claims that Santa Clarita deprived it of these interests by terminating the Development Agreement on January 1, 2021, and that Santa Clarita deprived it of substantive due process through its policy of repudiating the Development Agreement in order to "run out the clock" on Bermite's rights under the Development Agreement.

"A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994). While contracts may create constitutionally protected property interests, *see Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-77 (1972), "[i]t is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim." *San Bernardino Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty.*, 825 F.2d 1404, 1408 (9th Cir. 1987). "The prime protected category, which has supplied nearly all of the successful contract-based section 1983 actions, is that of employment contracts." *Id.* at 1409 (finding that plaintiff's contract to supply medical services to the state did not confer constitutionally protectible interest).

"[P]roperty interests are not created by the Constitution, but rather by 'existing rules or understandings that stem from an independent source such as state law.'" *Nunez v. City of L.A.*, 147 F.3d 867, 872 (9th Cir. 1998) (quoting *Roth*, 408 U.S. at 577). Under California law "[a] development agreement is a statutorily-authorized agreement between

a municipal government . . . and a property owner for the development of the property." *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 442 (2010). In the event of a breach of a development agreement, a party is entitled to seek a remedy through a breach of contract action. *Id.* at 457. "[T]he common law breach of contract claim provides adequate process for the deprivation of a property right derived from a contract, unless the deprivation constitutes a denial of a present entitlement." *DeBoer v. Pennington*, 287 F.3d 748, 749 (9th Cir. 2002). A present entitlement is "right by virtue of which [one is] presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001). No section 1983 claim lies where a plaintiff fails to set forth an "entitlement that it has been denied under the City contract that is not subsumed in its contract claim." *Abet Sec. Servs., Inc. v. City of L.A.*, No. 22-07713, 2023 WL 4155389, at *6 (C.D. Cal. May 12, 2023) (dismissing section 1983 due process claim by a security services company that contracted with the City of Los Angeles based on the City's removal of plaintiff's employees from their posts); *see also Pac. Mech. Corp. v. City of San Luis Obispo,* No. 08-109, 2008 WL 11411357, at *2 (C.D. Cal. Apr. 28, 2008), *aff'd*, 359 F. App'x 720 (9th Cir. 2009) (finding no constitutionally protected property interests where plaintiff's substantive and procedural due process claims were "directly related to the manner in which the City administered its contract, and whatever 'property' rights Plaintiff allege[d] it was deprived of, are those it is entitled to pursuant to its public works contract with the City").

"The government does not violate substantive due process each time it breaches a contract." *Bldg. 11 Invs. LLC v. City of Seattle*, 912 F. Supp. 2d 972, 981 (W.D. Wash. 2012). Here, Bermite's alleged protected interests are its property interest in the rights to develop Parcel B as set forth in the Specific Plan and Vesting Tentative Tract Map ("VTTM"), and its liberty interest in being able to carry out and benefit from the development plan. Its allegations that Santa Clarita deprived it of these interests by not extending the Development Agreement and by repudiating the Development Agreement are entirely "subsumed in its contract claims." *Abet*, 2023 WL 4155389, at *6. Bermite has not alleged any "present entitlement" sufficient for constitutional protection; rather,

the interests it alleges "can be fully protected by an ordinary breach-of-contract suit." *Lujan*, 532 U.S. at 196; *see also S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988) ("[A]n interest in enforcement of an ordinary commercial contract with a state is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection."). Because Bermite does not have constitutionally protected property or liberty interests arising from the Development Agreement, its section 1983 claim necessarily fails. Accordingly, this claim is DISMISSED WITH PREJUDICE.

Bermite's inverse condemnation claim fails for the same reason: it is simply a restatement of its breach of contract claim. Bermite alleges that "[t]he City's conduct in interfering with and depriving Bermite of its vested property rights, interests, and entitlements in parcel B, the [Development Agreement], the Specific Plan, the VTTM, and the development plan constitutes an unlawful physical taking for public use without just compensation" in violation of Bermite's Fifth and Fourteenth Amendment rights under the U.S. Constitution and Article 1, section 19 of the California Constitution. Bermite argues that its claim rests on the grounds that "as a result of the City's implementation of its Unlawful Policy, Bermite's vested rights and entitlements in the Development Agreement, Specific Plan, and the VTTM have reverted to the City for public use." (Doc. 71 at 25.; *see also* SAC ¶ 126.)

There are two types of takings recognized in the case law: physical takings, where the "government physically acquires private property for a public use," such as by occupying the property or acquiring it through eminent domain; and regulatory takings, wherein the government "imposes regulations that restrict an owner's ability to use his own property." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). Though Bermite argues that Santa Clarita's failure to extend the Development agreement was a physical taking (Doc. 71 at 25), it is plainly once again attempting to transform its contract claim into a constitutional one. It cites no case for the proposition that a breach of contract is a taking under either California or federal law. Rather, the cases it relies on involve the government taking property through eminent domain or other traditional means. *See, e.g.*, *City of Oakland v. Oakland Raiders*, 32 Cal. 3d 60, 63 (1982)

(involving taking through eminent domain the ownership of a professional football team); *City of L.A. v. Oliver*, 102 Cal. App. 299, 300 (1929) (considering condemnation of 370 parcels of land by the city of Los Angeles in order to widen existing streets and open new streets in the city).

"[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily . . . created by contract." *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978). The only "taking" here alleged is Bermite's breach of contract claim for the loss of its rights created by the Development Agreement; if every breach of a public contract could support a claim for inverse condemnation, it would "shift the whole of the public law of the states into the federal courts." *Goldin*, 844 F.2d at 966. Rather, "as with other government contracts, interference with such contractual rights generally gives rise only to a breach of contract action." *Bldg. 11*, 912 F. Supp. 2d at 981. Accordingly, Bermite's claim for inverse condemnation is DISMISSED WITH PREJUDICE.

### B. Cal. Civ. Proc. Code § 425.16

Santa Clarita argues that Bermite's state-law claims must be stricken under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16. It argues that Bermite's allegations that city personnel made misrepresentations to Bermite's prospective business partners regarding Bermite's development rights are protected conduct under the anti-SLAPP statute. Bermite argues that Santa Clarita has failed to show that the alleged statements by city personnel arose from an act taken in furtherance of Santa Clarita's right to petition or free speech and has failed to show that its conduct was in connection with a public issue.

#### 1. "Arising From"

In determining whether a cause of action "aris[es] from" an action in furtherance of a person's free speech rights, "the critical point is whether the plaintiff's cause of

action itself was based on an act in furtherance of the defendant's right of petition or free speech." *City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002) (emphasis omitted). "[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." *Park v. Bd. of Trs. of Cal. State Univ.*, 2 Cal. 5th 1057, 1063 (2017). Courts should be careful to "respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." *Id.* at 1064.

Bermite argues that its breach of contract claim does not arise from Santa Clarita's protected conduct, because it is based on Santa Clarita's decision to repudiate the contract, not the misrepresentations by city employees. (Doc. 72 at 11.) It further points out that its breach of contract claim is based on Santa Clarita's refusal to extend the Development Agreement, although one of the reasons it alleges that Santa Clarita was obliged to extend the Development Agreement was because of its implementation of the so-called "Unlawful Policy." Bermite relies on *Area 51 Productions, Inc. v. City of Alameda*, a California Court of Appeal decision where the court determined a breach of contract claim based on a city's termination of a licensing agreement did not arise from protected activity. 20 Cal. App. 5th 581, 596 (2018). Though defendants pointed to emails from the city conveying the decision to terminate the relationship, the court determined that "[t]he communications that led to and that followed the alleged injury-producing conduct – which is, at bottom, refusal to license to [the plaintiff] – are merely incidental to the asserted claims." *Id.*

However, the Court finds that *Area 51* is distinguishable from the present case. Though Bermite attempts to frame the alleged statements by city personnel as merely incidental to the breach of contract claim, the SAC makes clear that the statements to Bermite's prospective joint venture partners and lenders *were* the repudiation that Bermite alleges is the breach of contract. Similarly, any argument that the real wrong was the formation of the so-called Unlawful Policy, and that city representatives' statements were merely implementation of that policy is unpersuasive, because the

statements by city personnel to the prospective partners are themselves the wrongs for which Bermite is seeking to hold Santa Clarita liable. *See Navellier v. Sletten*, 29 Cal. 4th 82, 93 (2002) (finding breach of contract arose from constitutionally protected activity under anti-SLAPP statute where breaching conduct was the filing of a lawsuit).

The analysis is even more straightforward with Bermite's tortious interference and breach of the implied covenant of good faith and fair dealing claims. The interfering activity of which Bermite complains is Santa Clarita's statements to Bermite's prospective partners and lenders. (*See* SAC ¶¶ 106-116); *see also City of Costa Mesa v. D'Alessio Invs., LLC*, 214 Cal. App. 4th 358, 374-75 (2013) (finding claim for intentional interference with prospective economic advantage "based on the allegation that the five employees made 11 statements about D'Alessio and the Property resulting in economic harm to D'Alessio" arose from protected activity). As for Bermite's good faith claim, Bermite alleges that the implied covenant of good faith and fair dealing "prohibited the City from engaging in conduct that prevented Bermite from performing under the [Development Agreement], including the performance of the development plan for the Project on the Property." (SAC ¶ 122.) The alleged conduct that prevented Bermite from performing under the Development Agreement was the statements made by city employees to Bermite's prospective partners and lenders. Accordingly, Bermite's claim for breach of good faith also satisfies the anti-SLAPP statute's "arising from" requirement.

Finally, while some of the allegations regarding Bermite's state-law claims do not arise from speech-related activity (such as its allegation that Santa Clarita breached the Development Agreement by refusing to extend its term based on the DS-12 provision, discussed further below) where a claim is based in part on protected activity, the allegations relating to the protected activity are subject to being stricken under the anti-SLAPP statute. *See Baral v. Schnitt*, 1 Cal. 5th 376, 392, 396 (2016) ("At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of

both protected and unprotected activity, the unprotected activity is disregarded at this stage.").

### 2. In Connection with a Public Issue

California's anti-SLAPP statute applies to causes of action "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1). Under the statute, such acts include:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

*Id.* § 425.16(e). Santa Clarita argues that subsections (2), (3), and (4) are all applicable to the alleged statements by Santa Clarita personnel. Because the Court finds that subsection (4)'s "issue of public interest" applies, it does not discuss the other grounds.

"The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 479 (2000). Recognizing that "[a]t a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance," the California Supreme Court has clarified that "[w]hat a court scrutinizing

the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern." *Rand Res., LLC v. City of Carson*, 6 Cal. 5th 610, 625 (2019). Bermite argues that "[t]here is simply no direct connection between the viability of a developer's rights under a development agreement and a public issue or matter of public interest." (Doc. 72 at 15.)

The Court disagrees. The statements that Bermite alleges Santa Clarita personnel made were that Bermite lacked rights and entitlements to develop the property at issue in this case. The allegations of the SAC make clear that the development of this property was a matter of public interest: Bermite bases its claims in part on a quote by Santa Clarita's Director of Development Services to a local newspaper that the city anticipated a new development plan, and on a settlement agreement that Santa Clarita entered into with an environmental group regarding the development. (SAC ¶¶ 66, 80; Doc. 53-12.) Clearly, the development was an issue of local public interest. "The prospect of commercial and residential development of a substantial parcel of . . . property, with its potential environmental impacts, is plainly a matter of public interest." *Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist.*, 106 Cal. App. 4th 1219, 1233-34 (2003) (finding that communications about an exclusive negotiating agreement relating to a commercial development were regarding an issue of public interest).

Bermite argues that this case is analogous to *Rand Resources*, where the California Supreme Court considered a mayor's alleged misrepresentations about the identity of the city's agent in negotiations with the NFL. 6 Cal. 5th at 618. There, the court acknowledged that "who precisely represents a city in sports franchise negotiations could indeed conceivably prove a matter of public interest" but found that "Defendants failed to suggest anything more than the most attenuated connection between the identity of the City's agent and a matter of public importance." *Id.* at 625-26. Simply because the building of an NFL stadium in a city is undoubtedly a matter of public interest does not mean that all communication tangentially related to it concerns a matter of public interest. However, here Bermite has attached to the SAC a newspaper article specifically

discussing the issue of whether there was a development plan in place on the property and whether Santa Clarita would be implementing the Porta Bella development plan (*i.e.*, the plan contemplated in the Development Agreement). Moreover, the misrepresentations Bermite alleges concerning whether or not Bermite and SCLLC were entitled to develop the property are not about the kind of "routine functions" at issue in *Rand*. The identity of the developer of the project, and whether a development plan is in place, is a matter of public interest, as is made clear by the SAC and attached exhibits.

Accordingly, the Court proceeds to the second prong of the anti-SLAPP statute and determines whether Bermite has met its burden of establishing a probability of prevailing on the merits. Both Santa Clarita and Bermite rely on their 12(b)(6) motions for analysis of this question. Because Santa Clarita is making only a legal challenge to Bermite's claims, the Court evaluates Bermite's claims under the 12(b)(6) standard. *See Planned Parenthood*, 890 F.3d at 834.

### C. Tortious Interference

Santa Clarita argues that Bermite's claim for tortious interference must fail because Santa Clarita is immune from liability for the misrepresentations of its employees under California Government Code section 818.8. This statute provides that "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional." Cal. Gov. Code § 818.8. Recognizing that the word "misrepresentation" "potentially lends itself to extremely expansive and elusive interpretations" the California Supreme Court "has interpreted 'misrepresentation' to apply only to interferences with financial or commercial interests arising out of the common law concept of deceit." *City of Costa Mesa*, 214 Cal. App. 4th at 383 (quoting *Johnson v. State of Cal.*, 69 Cal. 2d 782, 799-800 (1968)) (cleaned up). "The Legislature, in creating this exemption, must have had in mind those areas in which private defendants typically face liability for

'misrepresentation'; in other areas, immunity for 'misrepresentation' would be superfluous." *Johnson*, 69 Cal. 2d at 800.

Bermite argues that section 818.8 is "irrelevant" to this action because "Bermite's claim for tortious interference does not rely upon or allege misrepresentations as the independently wrongful conduct," but, rather, alleges that the "independently wrongful conduct" its claim is based on is that Santa Clarita repudiated and breached the Development Agreement. However, "[b]ecause a bare breach of contract, without more, is not tortious, such a breach cannot constitute independently wrongful conduct capable of giving rise to the tort of intentional interference with a prospective economic advantage." *Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd.*, 71 Cal. App. 5th 528, 540 (2021). Moreover, the misrepresentations by Santa Clarita personnel plainly form the basis of Bermite's tortious interference claim. (*See* SAC at ¶ 111 and Exhibits 13 and 14 attached thereto, and discussion at section III.B.1 *supra*.)

Because Bermite's claim for tortious interference with contract is based on misrepresentations by government employees, the Court agrees with Santa Clarita that such claims are barred by Cal. Gov. Code section 818.8 under the plain language of the statute and California courts' interpretation of it.

Accordingly, Bermite's claim for tortious interference is DISMISSED WITH PREJUDICE and STRICKEN pursuant to Cal. Code. Civ. Pro. § 425.16.

### D. Breach of Contract

Bermite argues there are three grounds for its breach of contract claim: (1) Santa Clarita's rejection of an automatic extension of the Development Agreement based on a remediation delay caused by the DS-12 condition of approval; (2) Santa Clarita's rejection of an automatic extension of the Development Agreement based on Santa Clarita's interference with Bermite's performance; and (3) Santa Clarita's repudiation of the Development Agreement.

"Under California law, the elements of a cause of action for breach of contract are: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting damage to the plaintiff." *Wells v. U.S. Liab. Ins. Co.*, No. 22-08583, 2023 WL 4761551, at *4 (C.D. Cal. June 15, 2023) (quotations omitted). "Contract interpretation is a matter of law and 'solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence.'" *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1175 (C.D. Cal. 2009) (quoting *Super. Dispatch., Inc. v. Ins. Corp. of N.Y.*, 176 Cal. App. 4th 12, 31 (2009)). "[B]ecause the interpretation of a contract is a legal determination rather than a factual one, it is appropriate for resolution on a Motion to Dismiss." *Berman v. Amex Assurance Co.*, No. 08-01051, 2008 WL 11339649, at *3 (C.D. Cal. Nov. 14, 2008). However, any ambiguities in the language of the contract will be resolved in the non-moving party's favor at this stage. *Id.*

### 1. DS-12 Provision

On July 23, 2020, RFI sent Santa Clarita the RFTE, asking Santa Clarita to extend the term of the Development Agreement five years, to terminate on January 1, 2026. The RFTE is attached to the SAC. Bermite does not set forth facts in the SAC why the delay caused by the DS-12 provision required Santa Clarita to grant an automatic extension; rather, it simply says this extension was required because "[a]s a result of the circumstances RFI described in the RFTE, DS-12 became, in effect, a court-ordered injunction over which Bermite and SCLLC had no control."[1] (SAC ¶ 81.)

The RFTE Bermite has incorporated into the SAC by attachment contains an attachment, Exhibit A, which is three pages of argumentation about why Santa Clarita was required to extend the term of the Development Agreement. It states that

[1] This is not a proper means of pleading. *See Prayed v. Alaska R.R. Corp.*, No. 17-00036, 2019 WL 13241639, at *8 (D. Alaska Mar. 20, 2019) ("Facts found in exhibits attached to the complaint must be incorporated by *specific* reference in the complaint itself." (emphasis added)).

development of the property under the Development Agreement was subject to certain Final Conditions of Approval, adopted as Resolution 95-42, including the DS-12 Provision. (Doc. 53-12 at 3.)[2] This Provision, as quoted in the RFTE, states:

> For the entire 996 acre site, the applicant and/or future developer shall provide evidence, to the satisfaction of the City, of proper hazardous waste identification and remediation, from California Environmental Protection Agency/ Department of Toxic Substances Control prior to the issuance of any grading permits. Until such evidence has been received, no construction may commence on the entire site until it is cleared by Cal EPA/DTSC.

(*Id.*) The RFTE goes on to argue that "[t]he City has consistently taken the position that no grading or development of the subject property is allowed to occur until the entire site is environmentally remediated," and thus "DS-12 has unreasonably interfered with the Developer[']s ability to develop the property" per Paragraph 7(e) of the Development Agreement. (*Id.* at 3-4.) Bermite also argues that a settlement agreement Santa Clarita entered into with People for Environmentally Responsible Clean-Up ("PERC Settlement Agreement") "further strengthened" DS-12 because the settlement agreement – wherein Santa Clarita "agreed it would not modify or eliminate Condition DS-12" – "further enforced the development restrictions set forth in DS-12." (*Id.* at 4.) The settlement

[2] Santa Clarita has requested that the Court take judicial notice of Resolution 95-42. (Doc. 60.) "[U]nder Fed. R. Evid. 201, a court may take judicial notice of matters of public record" as long as the facts are not "subject to reasonable dispute." *Lee v. City of L.A.*, 250 F.3d 668, 689 (9th Cir. 2001) (quotations omitted). The Court notes that there are differences between the DS-12 Provision as quoted in the RFTE, and the DS-12 Provision in the Resolution submitted by Santa Clarita, which reads: "For the entire 996 acre site, the applicant and/or future developer shall provide evidence, to the satisfaction of the City, of proper hazardous waste identification and remediation, from California Environmental Protection Agency/Department of Toxic Substances Control." (Doc. 60 at 35.) The Court takes judicial notice of the Resolution, as this discrepancy is not here relevant because the Court's reasoning does not depend on the content of the DS-12 Provision.

agreement, Bermite argues, "ma[de] DS-12 a court ordered injunction." (*Id.*) In essence, Bermite argues that the Development Agreement's force majeure clause applies because the DS-12 Provision and the PERC Settlement Agreement constitute "causes beyond the control of" Bermite.

Accepting all of the *facts* Bermite has alleged as true, Bermite's *arguments* fail as a matter of law. Santa Clarita's settlement with a third party is not a court-ordered injunction. "A settlement is a contract, and its enforceability is governed by familiar principles of contract law." *Knudsen v. C.I.R.*, 793 F.3d 1030, 1035 (9th Cir. 2015). Nor is it similar to a court-ordered injunction in any way that would justify triggering the force majeure provision. Moreover, by Bermite's own allegations, the settlement did not alter the pre-existing provision in any way; rather, Santa Clarita agreed not to modify or eliminate DS-12.

Bermite's argument that compliance with DS-12 was a "cause" beyond its control fails at its inception, as the DS-12 Provision was adopted in 1995, years before Bermite acquired the property.[3] (*See* Doc. 60 at 14-59.) Santa Clarita entered into the settlement agreement with PERC on April 25, 2002. (Doc. 53-13 at 12-21.) Bermite argues that the DS-12 provision implicates the force majeure provision of the Development Agreement. However, under the plain terms of Paragraph 7(e), the cause that extends the Development Agreement must be "beyond the reasonable control of the party to be excused." *See also Nissho-Iwai Co., Ltd. v. Occidental Crude Sales*, 729 F.2d 1530, 1540 (5th Cir. 1984) ("California law of force majeure requires us to apply a reasonable control limitation to each specified event, regardless of what generalized contract interpretation rules would suggest."). Here, the "cause" was one that was in place when Bermite decided to purchase the property and attendant development rights. Contracts are formed through the mutual consent of the parties to be bound. *See Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998). Bermite consented to be bound by the DS-12 provision when it purchased Parcel B and acquired the vested rights and

[3] Bermite acquired parcel B, and "all vested rights and entitlements" to develop it in "early 2000." (SAC ¶ 23.)

entitlements to develop it. This provision cannot constitute a cause beyond Bermite's control.

### 2. Rejection of Automatic Extension Based on Santa Clarita's Interference with Bermite's Performance

Bermite next argues that Santa Clarita's interference with Bermite's prospective business partners triggered the automatic extension provision, and that Santa Clarita's failure to extend the Development Agreement upon Bermite's request was a breach of the agreement. (Doc. 72 at 21.) It argues that the delay caused by Santa Clarita's interference was beyond Bermite's control and therefore satisfied the requirements of the Development Agreement's force majeure provision. This argument fails for several reasons.[4]

In the first place, the provision specifies that it applies to extend the term of the Development Agreement due to "causes beyond the reasonable control of the party to be excused, including: war; insurrection; strikes; walkouts; riots; floods; earthquakes; fires; casualties; and acts of God; and court actions (such as restraining orders or injunctions)." Bermite's allegations that Santa Clarita interfered with its prospective partners and lenders are plainly different in kind from the enumerated force majeure events, all of which are external events, unrelated to the actions of a party to the Development Agreement.

While that is sufficient reason to reject Bermite's breach of contract claim, by its plain terms, the force majeure provision applies only when a party is prevented from, or unreasonably interfered with, doing an "act matter or thing" required by the Agreement.

[4] Santa Clarita argues that Bermite's misrepresentation-based breach of contract claims must fail because the city is immune from liability for employees' misrepresentations under Cal. Gov. Code § 818.8. However, Cal. Gov. Code § 818.8 does not apply to claims sounding in contract. *See* Cal. Gov. Code § 814 ("Nothing in this part affects liability based on contract or the right to obtain relief other than money or damages against a public entity or public employee.").

However, Santa Clarita allegedly interfered with Bermite's ability to get funding for the project, not with Bermite's performance of its duties under the Development Agreement. Bermite does not allege that the Development Agreement required it to obtain financing or to enter into an agreement with a joint venture partner or lender.

### 3. Repudiation

Finally, Bermite argues that Santa Clarita breached the Development Agreement by repudiating it, when it demonstrated an intention not to be bound by the agreement by "disavowing" the agreement to the public and by communicating with Blue Ox with an intent to "replace Bermite as the developer of the Project under the then-operative" Development Agreement. (Doc. 72 at 22-23.)

Repudiation is a form of "anticipatory breach." *Mammoth Lakes*, 191 Cal. App. 4th at 463. "When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time." *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975). "However, if the injured party disregards the repudiation and treats the contract as still in force, and the repudiation is retracted prior to the time of performance, then the repudiation is nullified and the injured party is left with his remedies, if any, invocable at the time of performance." *Id.* at 137–38.

"Principles governing anticipatory breach, including the concept of repudiation, apply only *before* the time of performance under the contract has arrived." *Malcolm Drilling Co., Inc. v. Davey Kent, Inc.*, No. 19-06974, 2021 WL 6199634, at *4 (N.D. Cal. Mar. 11, 2021). Here, the time for performance – whether defined as extending the Development Agreement, or not interfering with Bermite's attempts to secure financing – has passed. Accordingly, what remains is a claim for breach of contract. Repudiation is

not, in itself, a separate ground for breach, where the time for performance has come and Bermite has alleged nonperformance. Any claim for repudiation must now be subsumed in its breach claim, which, as shown above, Bermite has failed to state.

Accordingly, Bermite's claim for breach of contract is DISMISSED WITH PREJUDICE and STRICKEN pursuant to Cal. Code. Civ. Pro. § 425.16.

### E. Breach of Good Faith

"Every contract possesses an implied covenant of good faith and fair dealing in which 'neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" *Pashman v. Aetna Ins. Co*, 13-02835, 2014 WL 3571689, at *12 (N.D. Cal. July 18, 2014) (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988)).

Santa Clarita argues that Bermite's claim for breach of the implied covenant of good faith and fair dealing must fail because its breach of contract claim fails. (Doc. 58 at 27.) This is incorrect as a matter of law. *See Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373 (1992) (explaining that "breach of a specific provision of the contract is not a necessary prerequisite" to a claim for breach of the implied covenant of good faith). Nevertheless, determining whether behavior that has not breached an express term of the contract breaches the covenant of good faith is not straightforward. "If there exists a contractual relationship between the parties, . . . the implied covenant is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated in the contract." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1032 (1992). The purpose of the covenant of good faith is to "protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *Id.* at 1031 (quotations omitted). It operates to "prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract"

and "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Cobb v. Ironwood Country Club*, 233 Cal. App. 4th 960, 966 (2015) (quotations omitted).

Here, Bermite has adequately stated a claim for breach of the implied covenant of good faith and fair dealing. It has alleged that Santa Clarita frustrated its attempts to obtain funding by making misrepresentations to Bermite's prospective partners and lenders about Bermite's rights and entitlements under the Development Agreement. Taking Bermite's allegations as true and looking at the facts in the light most favorable to Bermite, it plausibly alleges a conscious and deliberate act by Santa Clarita that unfairly frustrated the common purposes of the Development Agreement and interfered with Bermite's ability to comply with the Development Agreement's express terms. *See L'Heureux v. Miller*, No. B322839, 2023 WL 4014484, at *19 (Cal. Ct. App. June 15, 2023) (unpublished) (finding plaintiff had shown likelihood of success on breach of implied covenant of good faith and fair dealing claim where plaintiff alleged defendants had granted him rights to adapt certain works, but then reneged on those agreements and told people in the entertainment industry not to work with plaintiff because he did not have the rights to use the works).

Because Bermite has stated a claim for breach of the implied covenant of good faith and fair dealing, the allegations regarding misrepresentations by Santa Clarita personnel are not stricken under Cal. Code Civ. Pro. § 425.16. *See Baral*, 1 Cal. 5th at 396 ("Allegations of protected activity supporting [a] stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing.").

## IV. CONCLUSION

For the foregoing reasons, Santa Clarita's Motion to Dismiss is GRANTED IN PART except as to Bermite's claim for breach of the implied covenant of good faith and fair dealing. Santa Clarita's Motion to Strike is GRANTED IN PART as set forth above.

Any motion for attorney fees pursuant to California Code of Civil Procedure section 425.16 by Santa Clarita must be filed within **fourteen days** of the issuance of this Order.

Initials of Deputy Clerk: gga